UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

COREY DESIMONI and JAMES
REITER, individually and on behalf of
all similarly situated

       Plaintiffs,

v.                                                              Case No:  2:15-cv-366-FtM-99CM

TBC CORPORATION,

       Defendant.

_____

## REPORT AMD RECOMMENDATION[1]

Before the Court is Defendant's Motion to Compel Arbitration and Supporting Memorandum of Law (Doc. 19),[2] filed on August 20, 2015.   On September 8, 2015, Plaintiffs filed a response in opposition.   Doc. 27.   On April 1, 2016, the motion was referred to the undersigned by the Honorable Sheri Polster Chappell to conduct an evidentiary hearing and issue a Report and Recommendation.   Doc. 36.   The

---

[1] A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.   A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.   See 11th Cir. R. 3-1.   **In order to expedite a final disposition of this matter, if the parties have no objection to this Report and Recommendation, they promptly may file a joint notice of no objection.**

[2] Disclaimer: Documents filed in CM/ECF may contain hyperlinks to other documents or Web sites. These hyperlinks are provided only for users' convenience. Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees. By allowing hyperlinks to other Web sites, this court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.

undersigned held an evidentiary hearing on May 11, 2016.  For the reasons that follow, the undersigned recommends that the motion be granted.

## I.    Background and Summary of Arguments[3]

On June 19, 2015, Plaintiffs Corey Desimoni and James Reiter filed this action on behalf of themselves and other similarly situated individuals against their former employer, TBC Corporation ("TBC" or "Defendant") who operates Tire Kingdom stores throughout Florida.  They allege that TBC did not pay its mechanic/technicians overtime in accordance with the Fair Labor Standards Act ("FLSA").  *See* Doc. 1.  Since the filing of the complaint, three opt-in Plaintiffs – Luis Rodriguez, Rex Earls, and Francis E. O'Brien III – have filed consents to join.   Docs. 3-1, 13-1, 35-1.

TBC contends that Corey Desimoni and Luis Rodriguez ("Plaintiffs") and Defendant are bound by mutual agreements to arbitrate.   TBC states that beginning October 2013 through present, all of TBC's new hires were required to sign arbitration agreements.  Doc. 19 at 2.  Between October 2013 and March 2014, the company's IT department created an employee portal through which its then-current employees could access and sign employee documents.  *Id.*  On March 13, 2014, the agreement was added to the portal.  *Id.*  A company-wide e-mail was circulated to notify employees of the addition to the portal and to provide instructions on how to access and sign the agreement.  *Id.*; Def. Ex. 1.  Additionally, store managers were

---

[3] On April 1, 2016, the district judge entered an order in which the background and legal standard have been thoroughly outlined.  The undersigned supplements some of the background and arguments with additional information produced at the hearing.

directed to notify store employees by printing and posting a notification of the arbitration agreement in a prominent location.   Doc. 19 at 2.

TBC contends that Rodriguez was hired on August 9, 2014 and signed the agreement at that time.   *Id.* at 3.   The motion states that Desimoni electronically signed his arbitration agreement via the employee portal on March 20, 2014.   *Id.*   At the hearing, evidence was presented that Desimoni worked for TBC during two different time frames.   He initially worked for TBC from August 2013 until he quit in August 2014.   He was rehired in February 2015 and worked until sometime in 2015.   At the hearing, TBC argued that Desimoni electronically signed the arbitration agreement through the employee portal the first time in March 20, 2014; he then subsequently signed the identical agreement during his rehiring process in February 19, 2015.   *See* Def. Exs. 12, 28.

In response, Plaintiffs argue that there is no evidence Desimoni was provided an arbitration agreement or that he agreed to arbitrate his FLSA claims.   Docs. 27 at 2, 8; 27-1.   At the hearing, Desimoni claimed that his store manager electronically signed both agreements without Desimoni's permission.   As to Rodriguez, Plaintiffs' response argues that his agreement to arbitrate has not been authenticated.   Doc. 27 at 10.   At the hearing, although an authenticated agreement containing Rodriguez' electronic signature was introduced in evidence, no evidence or arguments were introduced against enforceability of the agreement.   *See* Def. Ex. 26.   In their response, Plaintiffs make the alternative arguments that the agreements are unenforceable because they require waiver of collective actions and because they

require Plaintiffs to pay their own attorney's fees.   Doc. 27 at 10-12.

Based on the evidence at the evidentiary hearing and the undersigned's credibility determinations, the undersigned concludes that TBC met its *prima facie* burden to show the existence of agreements to arbitrate between it and Plaintiffs. Plaintiffs, however, have failed to meet their burden to show that despite the existence of these agreements, they did not agree to arbitrate their FLSA claims.

## II.   Summary of Evidence[4]

In order to properly assess Desimoni's claims that he never signed an arbitration agreement or agreed to arbitration, a review of TBC's hiring process and its method of communication with its employees is necessary.

### a.   *Background of TBC's hiring process and method of communication with its employees*

TBC uses a software called "Kronos" to hire new employees.   This initial hiring process is called "onboarding."   *See e.g.*, Def. Ex. 30.[5]   Hiring managers sign in to Kronos to view a list of applicants and select eligible candidates.   The manager then requests the selected candidate to consent to a drug test and a background check.   If the results are satisfactory, the manager begins the employee "onboarding"[6] process.   The manager either requests the candidate to complete the onboarding process at a computer located in a company store or through an e-mail

---

[4] Defendant called four witnesses: Corey Desimoni, Megan Filoon, John Murray, and David Kohlway, and introduced eleven exhibits.   *See* Doc. 53.   Plaintiffs called one witness: Corey Desimoni.   *Id.*

[5] Megan Filoon and John Murray also testified in detail regarding the onboarding process.

[6] Onboarding is the process through which candidates are required to complete all the company documents necessary to finalize the hiring process.

link sent to the candidate.   In either event, the candidate is requested to log in the Kronos system using his first name, last name, and last four digits of the social security number.   *See id.* at 3.

Upon log in, the employee is asked to consent to receipt of company communications in electronic form.   *Id.* at 4.   He must also agree to use an electronic click to sign documents.   *Id.* at 5.   He does this by clicking a box indicating his agreement.   *Id.*   The employee is then prompted to view a list of new hire forms, which includes an arbitration agreement and several other documents.   *Id.* at 6-7. After the applicant has viewed a particular document, the option to sign the document appears.   *Id.* at 9.   The applicant must electronically view and sign each individual document before he can proceed to the next step.   After all the documents have been signed, the applicant must click as to each individual document indicating that he has either printed the document or does not wish to print it.   *Id.* at 12.   He is unable to complete the onboarding process unless this step also is completed.   *Id.* at 14. After all these steps are complete, the applicant is notified that he may view the documents again on the company's intranet.   *Id.* at 15.

After the candidate completes the onboarding process and is offered employment, he is provided an employee number and a temporary password for the company's Employee Self Service ("ESS"), an intranet employee portal.   Upon his first log in to the ESS, the employee is prompted to select a permanent password. ESS allows employees to manage their personal records, and also it is a way for the company to communicate with its employees, such as notifying them of policy changes

and additional documents that employees need to sign.

David Kohlway[7] testified that the ESS is a secured connection with multiple challenge points.   For example, to sign in to the portal, the ESS requires the employee's username (the employee identification number) and a unique password. Once the employee has reviewed a document and wishes to sign it, he must enter the employee number and the last four digits of his social security number.   Thus, in order to sign a document, the employee must know his employee number, unique password, and last four digits of his social security number (all three together, "credentials").   Kohlway testified that because the password is encrypted, the IT department does not and cannot know someone's password.   If an employee forgets his password, the IT department would provide him a temporary password and instruct him to change the password upon log in.   Hypothetically, if a manager were to contact the IT department to obtain an employee's password, it would not provide the password but would instruct the manager to tell the employee to contact the IT department to reset the password.

Due to the different systems used during onboarding and in ESS, if the company wants to produce a record of when a document was signed, the record appears differently depending on which system was used.   For a document signed during onboarding, the company is able to retrieve the electronic copy of the document

---

[7] Kohlway has been employed with TBC since June 1, 2015 and is the company's information technology ("IT") director of engineering.   He is responsible for the creation, implementation, and maintenance of all computer systems used by TBC.   He testified that since his hire, there have not been any major changes to the company portal except for some "bug fixes."

that contains the electronic signature at the end.  *See e.g.,* Def. Ex. 12.  For a document signed through ESS, the company can retrieve a record of when the document was signed through its back-end data source, which is produced in the form of a screenshot.[8]  *See e.g.,* Def. Ex. 28.  The screenshot shows, *inter alia*, the employee number and the date and time of the electronic signature.  *See id.*  The screenshot also indicates if someone changed the record, who changed it, and when the record was last changed.[9]  *See id.*  Due to security features within the system, the employee's password and social security number do not appear on the screenshot. The screenshot also does not show the actual document that was signed; however, it contains the name and the URL address to the master document.

### b.   *Rollout of the arbitration agreement*

Megan Filoon[10] testified that on March 13, 2014, Human Resources issued a memorandum to all of its store managers describing an addition to the ESS portal of two new documents, one of which was the agreement at issue, titled Mutual Agreement to Arbitrate Claims and Waiver of Class/Collective Actions.  *See* Def. Ex. 1.  The memorandum instructed that all employees hired prior to October 15, 2013 must acknowledge the agreement no later than March 21, 2014.  *Id.*  The memorandum provided instructions on how to access and acknowledge the agreement.  The employees would click on a .pdf version of the agreement through

---

[8] Kohlway testified this was deemed acceptable by the IT department audit standards.

[9] On the top right corner of the screenshot, there is a field for "Chng."  The date in that field indicates the last time the record was altered.

[10] Filoon has been employed with TBC since October 2010 and is the Vice President of Human Resources.

ESS.  *Id.*  At the bottom of the page, the employee was required to enter his employee number and the last digits of his social security number to indicate his electronic signature to the agreement.  *Id.*  The agreement would be identical as to each employee.  Any employee who did not sign the agreement would be terminated. Filoon could recall two employees who were terminated for failure to sign the agreement.  Since 2013, TBC has not hired or rehired any employees who have not signed the agreement.

c.    <em>Rodriguez's arbitration agreement</em>

TBC admitted into evidence an arbitration agreement that was authenticated to be electronically signed by Rodriguez.  Def. Ex. 26.  Rodriguez did not testify at the hearing, and no evidence was produced to challenge the authenticity of this agreement or his assent to the agreement.

d.    <em>Desimoni's arbitration agreements</em>

TBC admitted into evidence two arbitration agreements that were electronically signed by Desimoni or someone using his credentials.  Def. Exs. 12, 28. TBC's Exhibit 28 is a screenshot of the arbitration agreement signed by someone with Desimoni's credentials through ESS on March 20, 2014.  Exhibit 12 is the agreement electronically signed by someone with Desimoni's credentials during his onboarding process for his rehire, and it shows a signature date of February 19, 2015.

John Murray[11] testified that on March 13, 2014, he received an e-mail from

---

[11] Murray has been employed with TBC for twelve years.  He is a manager of a Tire Kingdom store 123 where Desimoni worked during his employment in 2013-14 and during his first three weeks of re-employment in 2015.

Human Resources indicating the addition of the arbitration agreement to the employee portal.   He logged in to the portal and electronically signed the agreement himself using his employee number and last four digits of his social security number. Def. Ex. 33.   He also notified all employees in his store that they needed to log in the portal and sign the arbitration agreement.   He later received an e-mail from his district manager that Desimoni (and some other employees in the store) had not signed the arbitration agreement.   As Desimoni was not working that day, Murray called him on the phone and told him he needed to sign the arbitration agreement located in the employee portal.   Desimoni agreed.   Although Murray did not personally see Desimoni come into the store to log into the portal and sign the agreement, he had no reason to believe Desimoni did not comply because otherwise, the following day, he would have received a similar e-mail from the district manager.

Desimoni gave his two weeks' notice to quit his position with TBC on July 2014. Desimoni returned to work at Murray's location in February 2015.   Murray testified that Desimoni was required to complete an application and the onboarding process in February 2015 in order to be eligible for rehire.   In addition to the arbitration agreement, the following documents completed by someone with Desimoni's credentials through the onboarding process were introduced and admitted into evidence: TBC's Code of Conduct, TBC Associate Handbook and Acknowledgment, TBC's Travel and Entertainment Policy.   Def. Exs. 2, 5, 14.

       *d.*   *Desimoni's testimony*

With respect to the March 2014 arbitration agreement, Desimoni testified as

follows.   On a day when he was not working, his manager, Murray, called him on the telephone and notified him that if Desimoni wanted to keep his job, he needed to sign an arbitration agreement.   Desimoni asked to see the agreement first; however, Murray told him that Murray had already signed it.   Murray notified Desimoni that if he wanted to see the agreement, he could go to the store that day and look at it. Desimoni decided not to go because he figured he was already bound by the agreement if Murray already signed it for him.   According to Desimoni, Murray also told him he would provide a printed copy of the agreement and post the agreement, neither of which he did.   Desimoni testified that he never saw the arbitration agreement until the date of the hearing,[12] and he never saw any communication about the arbitration agreement.   He was, however, aware of the policy change regarding arbitration because there was "a big stink" between the employees about it.   He also testified that he would not have initiated the instant lawsuit if he knew that he was bound by an arbitration agreement.[13]   According to Desimoni, the signature on the screenshot indicating his electronic signature in March 2014 is just his employee number, to which all managers have access.

With respect to the February 2015 agreement, Desimoni testified that Murray verbally rehired him in February 2015; Desimoni was not required to complete any type of paperwork during his rehire, and he worked two weeks off the clock.   He did,

---

[12] Specifically, he testified "until today, I have never seen the arbitration agreement." Later, when asked by the Court, "you testified you never saw the arbitration agreement until today; correct?" He responded, "that's correct."

[13] Specifically, he testified "I wouldn't have sought help legally if I would have known that I was bound to an arbitration."

however, get paid for those two weeks.   When asked by defense counsel whether he had any reason to believe that someone else completed any paperwork in connection with his rehire in 2015, he responded, "considering it was normal practice at Tire Kingdom, yes."   He testified he never reported to human resources, the district manager, or anyone else that Murray signed the arbitration agreement on his behalf or that Murray had inappropriately used the computer systems.

　　　　　　　　e.   *Inconsistencies in evidence*

　　　　Except for Desimoni, each witness was able to authenticate the arbitration agreements introduced and admitted into evidence, and was able to draw conclusions that Defendant's Exhibits 12 and 28 were arbitration agreements electronically signed by Desimoni, and Exhibit 26 was an agreement electronically signed by Rodriguez, or at least that someone with their credentials signed the agreements. Desimoni testified that both agreements purportedly signed by him were signed by Murray.   Murray testified to the contrary.

　　　　According to Murray, as of March 2014, he had never seen Desimoni's social security number nor did he have any way to find Desimoni's social security number in company records.[14]   He also testified that he has never known Desimoni's ESS password.   Murray further testified that he has never hired an employee without their completing the onboarding process.   He testified that he did not electronically sign any document for Desimoni in February 2015.   He testified he knows that

---

[14]   Murray did not hire Desimoni the first time, in August 2013; however, he hired him the second time, in February 2015, and testified he saw his social security number then, during the onboarding process as he was helping Desimoni sign into Kronos.

signing documents for anyone other than his own is a terminable offense.   He also denied that Desimoni worked for any period of time without clocking in, and offered that he was likely paid by a "pay card" because his bank account information for direct deposit was not set up yet.   Kohlway testified that the only way for someone to have Desimoni's password and social security number was if he personally shared them. Desimoni testified that he never shared his password and social security number with Murray or anyone else.

### III.   Analysis

Under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."   9 U.S.C. § 2.   As provided by the FAA, any party aggrieved by the failure or refusal of another to arbitrate under a written agreement, may petition the Court to direct that arbitration proceed.   9 U.S.C. § 4.   In ruling on a motion to compel arbitration, courts consider three factors: (1) whether a valid written agreement to arbitrate exists; (2) whether an arbitrable issue exists; and (3) whether the right to arbitrate was waived.   *Dukes v. Sai Fort Myers B, LLC*, No. 2:14-CV-287-FTM-38, 2015 WL 3650804, at *2 (M.D. Fla. June 11, 2015); *Zahm v. OneWest Bank, N.A.*, No. 8:15-cv-765-T-30TBM, 2015 WL 2095644, at *1 (M.D. Fla. May 5, 2015) (citing *Cuningham Hamilton Quiter, P.A.*, 776 So. 2d 940, 942 (Fla. 3d DCA 2000)).   Only the first element is at issue here.

### a)   *Whether valid written agreements to arbitrate exists*

State law governs whether an enforceable agreement to arbitrate exists.

*Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1368 (11th Cir. 2005). "Federal policy favoring arbitration, however, is taken into consideration even in applying ordinary state law." *Id.*   Under Florida law, the three elements for a valid contract are offer, acceptance, and consideration.   *SCG Harbourwood, LLC v. Hanyan*, 93 So. 3d 1197, 1200 (Fla. 2nd DCA 2012).   The moving party has the initial burden to make *a prima facie* showing of the existence of an agreement to arbitrate. *In re W. Wiand*, No.  8:10–cv–71–T–17MAP, 2011 WL 4532070, *4 n. 13 (M.D. Fla. June 8, 2011).   The burden then shifts to the party opposing arbitration to show that even though there was some written contract, he did not actually agree to it. *See Chastain v. Robinson-Humphrey Co.*, 957 F.2d 851, 854 (11th Cir. 1992).

Based on the overall evidence at the hearing and the undersigned's credibility determination, the undersigned finds that TBC met its burden to make a *prima facie* showing of the existence of an agreement to arbitrate as between it and Rodriguez and of the existence of two identical agreements to arbitrate between it and Desimoni. On the other hand, neither Desimoni nor Rodriguez met their burden to show that despite the existence of the agreements admitted, they  did not actually agree to arbitration.   Rodriguez did not introduce any evidence whatsoever.   Desimoni only testified on his behalf.

The undersigned found Desimoni's testimony to be less than credible.   Twice during the hearing he testified that he had never seen the arbitration agreement until the date of the hearing, even though on September 8, 2015 he signed a declaration

stating "I have reviewed [the arbitration agreement] and I unequivocally state that I never saw or signed such an agreement."  Doc. 27-1 ¶ 4.  During the beginning of his testimony he testified that he never went back to the store to read the agreement because he figured he already was bound by it.  Later, he stated he would not have initiated the lawsuit if he knew he was bound by an arbitration agreement.  He also testified that his father works for the Pentagon and taught him to be extra careful with signing any documents, yet he chose to accept the manager's word that he was bound by an arbitration agreement without pressing to view the agreement.

TBC introduced evidence that the onboarding process has been in effect since 2011.  Desimoni testified he never completed his onboarding process during the first time he was hired in 2013 and that he sat in the office while the hiring manager inputted his personal information in the system.  Desimoni also testified that not once, but twice, Murray logged into Desimoni's portal and forged documents on his behalf.  He testified that Murray rehired him verbally in 2015 and that Desimoni was not paid the proper amount for the first two weeks of his rehire.  Murray, who has been employed with TBC for twelve years and knew that signing documents on an employees' behalf was a terminable offense, denied ever doing so.  It seems implausible that two different managers would forego the onboarding process and defy corporate policy of having an employee sign company documents for the same employee.  It also seems implausible that a company of 7,000 employees would rehire an employee without any paperwork whatsoever and not pay him for any period of time.

Thus, without any evidence to substantiate Plaintiffs' denial of the existence of agreements to arbitrate, the undersigned concludes that Plaintiffs have failed to meet their burden. *Chastain*, 957 F.2d at 855 ("A party cannot place the making of the arbitration agreement in issue simply by opining that no agreement exists. Rather, that party must substantiate the denial of the contract with enough evidence to make the denial colorable.")   In the alternative, the agreements are conditioned upon "employment and /or continued employment with TBC."   Def. Exs. 12, 26. Desimoni and each witness testified that they understood that employment or continued employment was conditioned on their assent to the agreement to arbitrate. Desimoni specifically testified that he was aware in March 2014 that his continued employment was conditioned on his assent to the arbitration agreement.   Yet, he continued to be employed with TBC for an additional four months before he decided to quit for unrelated reasons.   His continued employment with TBC constituted an acceptance of the agreement.   *See Caley*, 428 F.3d at 1369-70 (decided under Georgia law); *Czopek v. TBC Retail Group, Inc.*, 2014 WL 5782794, at *4 (M.D. Fla. Nov. 6, 2014) ("Under Florida law, continued employment can constitute acceptance of a contractual offer.") (citing *United Healthcare of Fla., Inc. v. Brown,* 984 So.2d 583, 586 (Fla. 4th DCA 2008)).

### b) Whether the agreements are enforceable

Plaintiffs first argue that the inclusion of a waiver of collective actions in the agreements renders them unenforceable.   Doc. 27 at 10.   A relevant portion of the this provision in the agreements states,

> the parties agree that no Claims may be initiated or maintained on a class action basis, collective action basis, or representative action basis either in court or arbitration. Any Claims must be brought in a party's individual capacity, and such claim may not be joined or consolidated in arbitration with Claims brought by other individuals. . . . Any issue concerning the enforceability or validity of this waiver must be decided by a court, and not by an arbitrator.

Def. Exs. 12 ¶ 2; 26 ¶ 2.   Plaintiffs argue, "it is clear that Defendant intended that any collective action be litigated in court rather than arbitration." Doc. 27 at 10.   A simple review of the agreement shows that this reading is not accurate.   The agreement clearly waives a party's right to bring a collective action in any forum. The Eleventh Circuit has held that the FLSA not does preclude enforcement of arbitration agreements that contain a waiver of collective actions.   *See Walthour v. Chipio Windshield Repair, LLC*, 745 F.3d 1326, 1334 (11th Cir. 2014) ("After examining the FLSA's text, legislative history, purposes, and these Supreme Court decisions, we discern no 'contrary congressional command' that precludes the enforcement of plaintiffs' Arbitration Agreements and their collective action waivers."); *see also Delano v. Mastec, Inc.*, No. 8:10-CV-320-T-27MAP, 2010 WL 4809081, at *7 (M.D. Fla. Nov. 18, 2010) ("Whether a class arbitration waiver frustrates the purpose of a federal statute is a question of federal law.").

Plaintiffs next argue that the agreement contains an attorney's fees clause that contradicts section 216(b) and is therefore unenforceable.   A relevant portion of the agreement states

> [t]he Company will pay any required administrative fees of the Arbitrator for his or her services, as well as any additional fees unique to arbitration.   Each party will be responsible for paying his/her/its own

attorney's fees and all other costs and fees incurred in connection with the Arbitration.

Def. Exs. 12; 26.   The agreements, however, also include a construction clause, which reads,

> [i]f any court of competent jurisdiction finds any part or provision of this Agreement void, voidable or otherwise unenforceable, such a finding will not affect the validity of the remainder of the Agreement and all other parts and provisions will remain in full force and effect.

Def. Exs. 12; 26.   Plaintiffs rely on *Hernandez v. Colonial Grocers, Inc.*, 124 So. 3d 408 (Fla. Dist. Ct. App. 2013) to argue that, under Florida law, an agreement that discourages a person to seek relief under federal law, especially in the context of attorney's fees, is unenforceable.   Doc. 27 at 11.   *Hernandez* involved an arbitration agreement that contained a prevailing party attorney's fee provision.   124 So.3d at 410.   In holding the agreement to be unenforceable, the court reasoned that such a clause would allow a prevailing defendant to be awarded attorneys' fees for an unsuccessful FLSA claim, rendering the cost of arbitration far greater than the potential cost of civil litigation.   *Id.*

The Eleventh Circuit has noted, however, that "[a] court compelling arbitration should decide only such issues as are essential to defining the nature of the forum in which a dispute will be decided."   *Musnick v. King Motor Co. of Fort Lauderdale*, 325 F.3d 1255, 1261 (11th Cir. 2003) (internal quotations and citation omitted). Moreover, "[w]hether federal public policy prohibits an individual from waiving certain statutory remedies [such as attorney's fees] is an issue that may be raised when challenging an arbitrator's award[,]" and until the arbitrator has reach such

decision and such motion is filed with the district court, the issue is not ripe. *Id.* The *Musnick* court declined to decide the validity of a "loser pays" attorney's fees provision on the basis that it would be too speculative to reach a decision before the arbitrator decides the issue and before a motion seeking judicial review of the arbitrator award is filed before the court. *Id.* Other federal courts that have considered similar provisions requiring the plaintiff to cover his own attorney's fees even if he ultimately were to prevail and found them to be unenforceable have nonetheless compelled arbitration. *See, e.g., Schatt v. Aventura Limousine & Transportation Service, Inc.*, No. 10-22353-Civ., 2010 WL 4942654, at *3 (S.D. Fla. Nov. 30, 2010) ("It is clear that Plaintiff cannot be found to have waived his right to recover his attorney's fees.  Thus, the provision regarding attorney's fees is unenforceable as applied to this FLSA proceeding.") (citing *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1355 (11th Cir. 1982)).   In light of the foregoing, the undersigned recommends that the parties be compelled to arbitrate their claims regardless of the attorney's fees provision.   In the alternative, where, as here, the relevant contract includes a severability provision, the remainder of the agreement will be unaffected. *Schatt*, 2010 WL 4942654, at * 3; *see also Frankenmuth Mut. Ins. Co. v. Escambia Cty., Fla.*, 289 F.3d 723, 729 (11th Cir. 2002) (holding a contract clause was severable under Florida law because "the fact that the contract itself contains a severability provision demonstrates that the parties intended for the contract to be severable.").

IV.    Conclusion

For the foregoing reasons, it is **RESPECTFULLY RECOMMENDED** that Defendant's Motion to Compel Arbitration and Supporting Memorandum of Law (Doc. 19) be granted and the claims of Plaintiff Corey Desimoni and opt-in Plaintiff Luis Rodriguez be stayed pending arbitration.  *See Bender v. A.G. Edwards & Sons, Inc.*, 971 F.2d 698, 699 (11th Cir. 1992) ("Upon finding that a claim is subject to an arbitration agreement, the court should order that the action be stayed pending arbitration.") (citing 9 U.S.C. § 3).

**DONE** and **ENTERED** in Fort Myers, Florida on this 9th day of June, 2016.

CAROL MIRANDO
United States Magistrate Judge

Copies:
Counsel of record